Paul B. Mengedoth (018507)
**MENGEDOTH LAW PLLC**
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Tel: (480) 778-9100
Fax: (480) 778-9101
E-mail:  paul@mengedothlaw.com

Sylvia A. Goldsmith, Esq. (*Pro Hac Vice Pending*)
Geoffrey B. McCarrell, Esq. (*Pro Hac Vice Pending*)
**LAW OFFICE OF SYLVIA A. GOLDSMITH**
Milano Law Office
2639 Wooster Road
Rocky River, OH 44116
Tel: (440) 934-3025
Fax: (440) 934-3026
E-mail:sgoldsmith@sgoldsmithlawoffice.com

Attorneys for Plaintiffs James and Katherine McCalmont

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| JAMES AND KATHERINE MCCALMONT, married individuals,<br><br>        Plaintiffs,<br><br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION and FEDERAL HOUSING FINANCE AGENCY AS CONSERVATOR OF THE FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br><br>        Defendants. | No. _____<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL REQUESTED** |

# I. PRELIMINARY STATEMENT

1.      Plaintiffs James and Katherine McCalmont, mortgage applicants subjected to the repeated violation of and intentional non-compliance with the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq*. (the "FCRA"), bring this action against Defendants Federal National Mortgage Association ("Fannie Mae") and Federal Housing Finance Agency ("FHFA") as the Conservator of the Federal National Mortgage Association.

2.      As a well-known colossus in the secondary mortgage loan market, Fannie Mae also silently plays a dominant role in home mortgage loan origination.  While its involvement in the loan origination process is largely unknown to the public, Fannie Mae exerts a tremendous influence on each step of the application process.  Through its automated underwriting system that it requires lenders to use throughout the country, Fannie Mae obtains, reviews and evaluates consumer credit information in advance of loan origination for its own underwriting purposes; charges lenders, brokers and consumers for this information through the generation and publication of consumer reports; and dictates to lenders and consumers the outcome of mortgage loan applications, including rates and terms.  This process enables Fannie Mae to reap significant profits by carrying out a business model based on risk-based pricing and the collection of fees for each loan application run through its automated underwriting system.

3.     However, despite its manifold roles as a user of credit information, a consumer reporting agency and a reseller of credit information in a typical mortgage transaction, Fannie Mae has deliberately made itself unaccountable to consumers, and intentionally fails to comply with any of the requirements imposed on it by the FCRA.

4.     Fannie Mae's flagrant disregard for the law results from a presumed contention that, as a government sponsored enterprise, it is somehow exempt from the grave responsibilities imposed by the FCRA on every other company that assembles, uses, disseminates and/or sells consumer credit information.   As such, mortgage applicants like Plaintiffs are harmed because they are denied certain rights guaranteed by the FCRA,  including  the  ability  to  discover  what  information  may  have impacted  their  loan eligibility, the right to request and/or dispute the information that was considered in connection with their applications, and the right to expect that their credit information was reported with maximum possible accuracy.

## II.  PARTIES

5.     Plaintiffs Mr. and Mrs. McCalmont are married adult individuals who are residents of Scottsdale, Maricopa County, Arizona.

6.     Defendant Fannie Mae is a publicly held corporation that has a principal place of business located at 3900 Wisconsin Ave., NW Washington, DC 20016-2892, and which regularly conducts business throughout Arizona and in all fifty (50) states in the United States.

7.     Defendant Federal Housing Finance Agency ("FHFA") is an independent federal agency, created under the Housing and Economic Recovery Act of 2008, Pub.L. No. 110–289, 122 Stat. 2654 (codified at 12 U.S.C. § 4617 *et seq*.). On September 6, 2008, Fannie Mae was placed under the conservatorship of the FHFA.

8.     Fannie Mae is a "consumer reporting agency" as that term is defined by Section 1681a(f) of the FCRA.

### III.  JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1337.

10.     Venue in this judicial district is proper because Mr. and Mrs. McCalmont reside in this judicial district and many of the facts relevant to this Complaint occurred in this judicial district.

### IV.  FACTUAL ALLEGATIONS

#### A.  Fannie Mae and Its Automated Desktop Underwriter System

11.     Fannie Mae is a shareholder-owned for-profit corporation that is publicly traded on the U.S. Stock Exchange.

12.     Fannie Mae is also a government-sponsored enterprise ("GSE") because it was chartered by Congress to provide a secondary market for home mortgages.  In exchange for its agreement to act as a mortgage loan purchaser in the secondary market, Fannie Mae's charter provides it with certain financial advantages and incentives.

13.     Due to federal banking regulations requiring most primary mortgage lenders to maintain minimum capital, after originating mortgage loans, many mortgage lenders in the United States sell their loans to Fannie Mae.

14.     Fannie Mae, together with its "little brother" Freddie Mac, purchase or guarantee more than half of all mortgages originated in the United States, depending upon market conditions and consumer trends.

15.     Fannie Mae purchases what are known as conventional conforming loans. These are loans that are not insured or guaranteed by the federal government, are less than $417,000, and have certain prescribed risk characteristics. Fannie Mae publishes its Selling Guide which outlines the specific requirements necessary for eligibility for Fannie Mae purchase.

16.     Fannie Mae buys these conventional conforming loans and either bundles them as securities and sells them to investors or holds the loans in its own portfolios.

17.     Unknown to the public, and due to its status as one of the two (2) dominant secondary market purchasers of mortgages, along with mortgage lenders' interest in assuring the sale of their loans, Fannie Mae has entered into contracts with numerous mortgage lenders throughout the United States which, in exchange for its advance commitment to buy mortgage loans from these lenders in the secondary market, allow it to dictate the underwriting terms and conditions of most of the conventional conforming loans that these lenders originate.

5

18.   For the mortgage lenders who have contracts with Fannie Mae and who sell mortgage loans to Fannie Mae in the secondary market, Fannie Mae requires that mortgage brokers and lenders submit residential mortgage applications through its Desktop Underwriter automated underwriting system ("DU") in order to get a quick approval or denial, the best lender/broker pricing, higher debt-to-income ratios, higher loan-to-value ratios, better loan programs not available outside DU, and risk-based pricing, before any commitment is made to the prospective borrowers.

19.   For these brokers and lenders, Fannie Mae leases or licenses its DU system for use by the lenders or mortgage loan brokers and charges these lenders or brokers a fee for each mortgage application run through the DU system.

20.   Fannie Mae's DU system is also used in connection with non-conforming loans that Fannie Mae is not permitted to purchase pursuant to its congressional charter. These other types of loans include, but are not limited to FHA, Jumbo, and sub-prime loans.

21.   Through the DU system, Fannie Mae obtains an applicant's three-file and/or "tri-merge" consumer report from either a reseller of credit information, or one or more of the three (3) major credit repositories, Equifax, Trans Union and Experian, which Fannie Mae sells to the lender or broker.

22.   Fannie Mae's DU system assembles reviews, assesses and evaluates all of the information it obtains from the lender and/or broker, and the consumer reporting agencies and/or resellers, including the consumer reports, and generates its own report,

known most frequently as the Desktop Underwriting Findings report ("DU Findings Report").

23.     The DU Findings Report is a detailed report documenting, among other things, the applicant's credit history, credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, mode of living, assets, income, debt-to-income ratio, and employment.  Further, the DU Findings Report contains findings, conclusions, comments and results reached by Fannie Mae concerning the applicant's credit and his or her "eligibility" for loan purchase by Fannie Mae, as well as Fannie Mae's recommendation as to whether the lender should grant or originate the loan, deny the loan or approve it subject to certain conditions being satisfied.  These DU Findings determinations are made for all types of loans submitted through DU, whether or not Fannie Mae purchases them in the secondary market.

24.     Upon information and belief, most mortgage brokers and lenders do not disclose all or part of an applicant's DU Findings Report to the consumers to whom they relate in the ordinary course of their submission of a mortgage loan application to Fannie Mae.

25.     If Fannie Mae determines that a consumer is ineligible for loan purchase, or may only be approved subject to a change in loan terms, a higher interest rate, the imposition of additional fees, charges, documentation or the satisfaction of certain underwriting conditions based on information contained in the consumer report it

obtains, it does not provide the consumer with any notice of the adverse action it has taken, in violation of the FCRA.

26.     Further, despite the fact that it compiles, issues, maintains and sells its DU Findings Reports to lenders and/or brokers on a nationwide basis, Fannie Mae does not provide consumers with disclosures of the files it maintains on them, the sources of the information it reports, summaries of their rights, does not maintain any toll-free telephone numbers available to consumers and does not investigate any consumer disputes, in further violation of the FCRA.

27.     Fannie Mae has been placed on notice that the Federal Trade Commission, the primary financial regulator first provided with the authority by Congress to interpret the provisions of the FCRA, long ago emphasized and characterized the FCRA was designed to cover a very broad range of "assembling" or "evaluating" activities and bring many entities within the ambit of the FCRA.  *See* FTC Staff Opinion Letter, William Haynes (June 9, 1998), 1998 WL 3423759.

**B.   Plaintiffs Negotiated a Short Sale of Their Home**

28.     Plaintiffs were the owners of a home with a loan that was subject to a first mortgage with Chase Bank, and a second mortgage with Wells Fargo Bank.

29.     Like millions of other Americans adversely impacted by the downturn of the economy, Plaintiffs found themselves struggling to pay their mortgages.

30.     In November 2008, Plaintiffs initiated a loan modification with Chase Bank in hopes of lessening the burden of their monthly mortgage payments.

8

31.     After several months of negotiations with Chase Bank, the loan modification was declined in March 2009.

32.     Immediately after the loan modification was declined, Plaintiffs retained an attorney to assist them in negotiating a short sale of the property.

33.     Plaintiffs were advised by Chase Bank that no short sale could be approved if their monthly mortgage payments were current.  Therefore, in March 2009, Plaintiffs stopped making their mortgage payments to both Chase Bank and to Wells Fargo Bank.

34.     On October 26, 2009, the short sale of Plaintiffs' home closed escrow.

35.     Pursuant to Fannie Mae's published Desktop Underwriter Guidelines ("DU Guidelines"), Plaintiffs would not be able to qualify for conventional financing for a minimum of two (2) years following this short sale.

### C. Plaintiffs Were Denied Mortgage Financing For The Shetland Trail Property

36.     In October 2011, having waited the mandatory two (2) years, Plaintiffs contacted a company called Pinnacle Lending to obtain pre-qualification for financing to buy another home.  Plaintiffs discovered that the close of escrow date on their short sale was entered incorrectly as January 2010, so any financing of a home purchase would have to wait until January 2012.

37.     Mindful of the length of time necessary to close on a new home loan, Plaintiffs discontinued their efforts to buy another home and then contacted Pinnacle

Lending again in November 2011 to obtain a pre-qualification letter in connection with a particular piece of property Plaintiffs' hoped to buy (the "Shetland Trail property").

38.    The Shetland Trail property was being sold in a short sale by its current owner with approval of his current mortgage holder.

39.    Pinnacle Lending told Plaintiffs that they would not be approved for financing because their own previous short sale was flagged as a "foreclosure" which, per DU Guidelines, would prevent Plaintiffs from obtaining financing for seven (7) years.  Plaintiffs were confused since their previous home was never in foreclosure at any point.

40.    Upon information and belief, and unknown to Plaintiff at the time, Pinnacle Lending obtained and relied upon a DU Finding Report it purchased from Defendant Fannie Mae on or before November of 2011 and which DU Finding Report falsely stated that Plaintiffs first and second mortgage loans were coded as a foreclosure instead of a short sale.

41.    In hopes that Plaintiffs could still buy the Shetland Trail property, Pinnacle Lending contacted each of the credit bureaus for Plaintiffs to dispute the "foreclosure."  Since none of Plaintiffs' credit reports contained any reference to foreclosure, these disputes were dismissed by the credit bureaus.

42.    Plaintiffs were unable to secure financing for the Shetland Trail property based at least in part on the false information in a DU Findings Report, and their contract to purchase that home was terminated.

**D.  Plaintiffs Were Denied Mortgage Financing For**
**The Timberlane Property**

43.    In January 2012, Plaintiffs found another piece of property (the "Timberlane Court property") that they wanted to purchase.

44.    Hopeful that the underlying "foreclosure" issue was related to the incorrect entry of their short sale in January 2010 (instead of October 2009), Plaintiffs contacted Amerifirst Financial to obtain a pre-qualification letter.

45.    Plaintiffs successfully obtained a pre-qualification letter from Amerifirst Financial on January 31, 2012.

46.    Plaintiffs were excited that they were able to pre-qualify for financing, and made an offer on the Timberlane Court property.  Plaintiffs offer was accepted and escrow was opened on or around February 3, 2012.  The loan was scheduled to close one month later.

47.    On March 1, 2013, Plaintiffs learned that their loan application was denied.

48.    Plaintiffs were shocked, embarrassed and devastated.

49.    Upon information and belief, and unknown to Plaintiffs at the time, Amerifirst obtained and relied upon a DU Finding Report it purchased from Defendant Fannie Mae and which DU Finding Report falsely stated that Plaintiffs first and second mortgage loans were coded as a foreclosure instead of a short sale.

50.     Plaintiffs were unable to secure financing for the Timberline Court property from Amerifirst based at least in part on the false information in a DU Findings Report Defendant Fannie Mae provided to Amerifirst.

51.     As a local real estate agent, Mrs. McCalmont was humiliated that her personal contract for real estate fell through in the eleventh hour.  She believed and feared that word of the cancellation of the Timberlane Court contract would damage her reputation as an agent.

52.     Both Plaintiffs were especially aggravated and disheartened by the fact that there was seemingly nothing they could do about the "foreclosure" notation that was preventing them from obtaining financing, and that, to date, they could find no evidence of it anywhere on their personal credit reports.

**E.  Plaintiffs Were Forced To Obtain A Personal Loan To Purchase A Home**

53.     Plaintiffs still wanted to purchase a home and felt they were left with few options to do so.

54.     While dealing with the financial, mental and emotional strains of their two (2) previous failed efforts to purchase a home, Plaintiffs learned that the Shetland Trail property they originally tried to purchase had come back on the market (as Plaintiffs' earlier attempt to purchase the property fell through, the owner of the Shetland Trail property fell into foreclosure and the bank was now selling the property).  Plaintiffs were determined not to let this property slip through their fingers again.

55.     Knowing that the "foreclosure" notation would prevent approval at most lending institutions and determined not to suffer that embarrassment and disappointment again, Plaintiffs contacted a private bank, Republic Bank, to explore their financing options.

56.     In order to purchase the Shetland Trail property, Plaintiffs were required to take out a personal, hard-money loan for the purchase price to be paid in cash.  This interest-only loan has an adjustable APR of no less than 7% and must be repaid (or refinanced) within three (3) years.   Additionally, Plaintiffs were required to put $140,000 cash into a Certificate of Deposit as collateral.

57.     While Plaintiffs were relieved to be able to secure *any* financing to purchase the Shetland Trail property, this financing is significantly more expensive for Plaintiffs' than the terms of the previous loan on which they were prequalified.

58.     Plaintiffs closed on the Shetland Trail property on April 2, 2012.

**F.  Plaintiffs Were Denied Refinancing Of The Shetland Trail Property**

59.     Over the next several months, Plaintiffs tried desperately to find answers to their problem of the "foreclosure" notation which was preventing them from obtaining traditional mortgage financing.

60.     Plaintiffs were desperate for such answers so they could make sure to refinance the Shetland Trail property before the three-year period expired on their current adjustable, hard-money loan with Republic Bank.

13

61.     Plaintiffs repeatedly came up empty.  Contacts with various mortgage brokers/lenders, Plaintiffs' first and second mortgage holders on the short sale property, and the Big Three credit bureaus, Equifax, Experian and Trans Union, all continued to confirm that no one was reporting that Plaintiffs were ever in foreclosure on that property.

62.     With the housing market finally starting to show signs of recovery and home loan interest rates beginning to rise, and with a deadline to refinance hanging over their heads, Plaintiffs contacted Homeowners Financial Group in hopes of refinancing the Shetland Trail property in February 2013.

63.     Once again, a "foreclosure" notation prevented Plaintiffs from refinancing the Shetland Trail property.

64.     Upon information and belief, and unknown to Plaintiffs at the time, Homeowners Financial obtained and relied upon a DU Finding Report it purchased from Defendant Fannie Mae and which DU Finding Report falsely stated that Plaintiffs first and second mortgage loans were coded as a foreclosure instead of a short sale.

65.     Plaintiffs were unable to refinance the Timberline Court property with Homeowners Financial based at least in part on the false information in a DU Findings Report Defendant Fannie Mae provided to Homeowners Financial.

66.     Plaintiffs' level of frustration and desperation with the entire ordeal continued to grow.

**G. Plaintiffs' Uncover The False Foreclosure Notation In DU Findings**

14

67.     As part of their latest efforts to get to the bottom of the false "foreclosure" notation, Plaintiffs received a copy of the DU Findings Report pertaining to them that Homeowners Financial Group obtained from Defendant Fannie Mae

68.     These DU Findings correctly noted a potential short sale in its *Risk/Eligibility* section:

6   The credit report has identified an account that may have been subject to a preforeclosure sale. The preforeclosure sale must have been completed two or more years from the credit report date, and the loan casefile must comply with all other requirements specific to preforeclosure sales as specified in the Fannie Mae Selling Guide.

| Borrower | Creditor | Account Number |
|---|---|---|
| JAMES A MCCALMONT | CHASE | ▓▓▓▓▓▓▓▓▓▓ |
| JAMES A MCCALMONT | WELSHMQTY | ▓▓▓▓▓▓▓▓▓▓ |
| JAMES A MCCALMONT | JPM CHASE | ▓▓▓ |

*See* DU Findings, dated March 12, 2013 (a copy of which is attached hereto as Exhibit 1), at Page 2 of 7.  These DU Findings further note that so long as the short sale was "completed two or more years from the credit report date" the loan could still be approved. *Id.*

69.     However, the DU Findings reported that the proposed loan was not eligible for delivery to Fannie Mae because of a foreclosure:

2  Desktop Underwriter has identified a deed-in-lieu of foreclosure that was reported within the last two years, or a foreclosure that was reported within the last seven years. This loan is ineligible for delivery to Fannie Mae.

| Borrower | Creditor | FC Type | Account Number | Date Reported |
|----------|----------|---------|----------------|---------------|
| JAMES A MCCALMONT | CHASE | Foreclosure | ▓▓▓▓▓▓▓▓▓▓ | 03/12 |
| JAMES A MCCALMONT | WELSHMQTY | Foreclosure | ▓▓▓▓▓▓▓▓▓▓ | 02/13 |
| JAMES A MCCALMONT | JPM CHASE | Foreclosure | ▓▓▓ | 03/13 |

*See* Exhibit 1 at Page 1 of 7.  This resulted in a "Refer with Caution" recommendation which amounts to a credit denial per Fannie Mae's *Selling Guide*.  *Id.* at 5 of 7.

70. Homeowners Financial Group also shared with Plaintiffs the tri-merge credit report used in connection with Plaintiffs' credit application.  See Advantage Plus Tri-merge Credit Report dated March 12, 2013 (a redacted copy of which is attached hereto as Exhibit 2).

71. This tri-merge report confirmed that despite Plaintiffs' short sale (and the delinquent mortgage payments immediately preceding same), Plaintiffs' credit scores remained in the 700s and would otherwise allow them to obtain traditional mortgage financing.  *See* Exhibit 2 at 1 of 11.

72. The Advantage Plus tri-merge report further confirmed that none of Plaintiffs' creditors were reporting Plaintiffs as having been through a foreclosure.  *See generally*, Exhibit 2.

16

73.    For the first time, Plaintiffs began to understand that their inability to obtain traditional mortgage financing was a result of Fannie Mae's reading (or misreading) of Plaintiffs' accurate credit report information.

## H. DU Wrongly Flags Any Serious Mortgage Delinquency As A Foreclosure

74.    Plaintiffs are just two of potentially millions of consumers who have been unable to obtain mortgage financing because a previous short sale has wrongly been flagged by Fannie Mae as a foreclosure.

75.    On March 13, 2013, Fannie Mae released a "Desktop Underwriter Clarification" in response to mounting "requests for clarification on how Desktop Underwriter (DU) identifies a foreclosure and a pre-foreclosure sale[.]" *See* Desktop Underwriter Clarification (a copy of which is attached hereto as Exhibit 3).

76.    In this regard, Fannie Mae described DU's identification of a pre-foreclosure or short sale as follows:

**Preforeclosure Sale Identification**

**Preforeclosure Sale Identification**

A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved.  At this time, there are no codes provided in the credit report data received by DU that specifically identify a preforeclosure sale.

With DU Version 8.2 in December 2010, DU began issuing a message based on the presence of Remarks Codes E0047 (Settlement accepted on this account), T0140 (Settled for less than full balance), or R0107 (Account legally paid in full for less the full balance) on a mortgage or HELOC account.  However, because those codes can be used on any account for any reason, DU is not able to use those codes to identify a preforeclosure sale with 100% accuracy, so it is not able to fully automate the preforeclosure sale waiting period or eligibility requirements.

When DU issues the preforeclosure sale message the lender must confirm that the preforeclosure sale had been completed two or more years from the credit report date, and must confirm that the loan casefile complies with all other requirements specific to preforeclosure sales as specified in the Fannie Mae *Selling Guide*.

*See* Exhibit 3 at 1 of 3.

77.   Per the DU Findings Report used to deny Plaintiffs their refinancing application, Plaintiffs' previous short-sale was specifically identified by DU. *See* Exhibit 1 at Page 2 of 7.

78.   So long as the pre-foreclosure or short-sale was completed more than two (2) years before the current application, that prospective loan is still eligible for purchase by Fannie Mae and DU will not refer, i.e., deny, the application. *See Selling Guide*, Part B, Subpart 3, Chapter 5 (a copy of the relevant excerpt of the 2011 and 2013 versions is attached hereto as Exhibit 4) at 434 and 465 respectively.

79.   In describing DU's identification of a foreclosure, Fannie Mae represents as follows:

**Foreclosure Identification**

When reviewing the credit report data received, DU reviews the manner of payment (MOP) codes and Remarks Codes associated with each tradeline, and the Public Record information to determine if a foreclosure has occurred.

Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as subject to a foreclosure if there is a current status code or MOP code of "8" (foreclosure) or "9" (collection or charge-off); or if there is a foreclosure-related Remarks Code present in the credit report data and associated to the tradeline.  If a foreclosure was reported within the seven-year period prior to the report date associated with the tradeline, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae as a DU loan.

See Exhibit 3 at 1 of 3.

80.   Per this "Desktop Underwriter Clarification," Fannie Mae admits that accounts reported by the original creditor merely as "collection or charge-off" – accounts admittedly not in foreclosure – will be identified by the DU system as having been in foreclosure.

18

81.   Any prospective loan that DU identifies as having a foreclosure in the previous seven (7) years will automatically be ineligible for purchase by Fannie Mae. *See* Exhibit 4 at 464.

82.   So even though DU correctly identified Plaintiffs' previous short sale, acknowledging that so long as that short sale was more than two (2) years ago, DU also manufactured a non-existent foreclosure for Plaintiffs and referred, i.e., denied, their application accordingly.

83.   This incorrect identification by DU prevented Plaintiffs from obtaining any conventional financing or refinancing for a home.

**I.   Fannie Mae Acknowledges Deficiency in DU Computer Software.**

84.   Upon information and belief, the McCalmonts are only two of hundreds of thousands (if not greater numbers) of individual consumers who have had a short sale misidentified by DU as a foreclosure, thereby preventing them from obtaining conventional financing.

85.   In May 2013, the *Consumer Protection Subcommittee* of the *U.S. Senate Committee on Commerce, Science & Transportation* held a hearing on Capitol Hill to address a variety of problems plaguing the consumer reporting industry.

86.   During this hearing, Senator Bill Nelson, D-Fla, raised serious concerns about the significant and growing numbers of his constituents that had been denied conventional financing due to DU wrongly identifying a foreclosure in addition to or instead of a short sale.

87.     After months of prodding from Senator Nelson, the federal *Consumer Financial Protection Bureau*, the *National Consumer Reporting Association* and the *National Association of Realtors*, Fannie Mae announced a change to its automated DU system to "fix" the problem:

***Underwriting when Conflicting or Inaccurate Foreclosure Information Provided on DIL or PFS Tradeline***
Fannie Mae has been made aware that there are often inconsistencies in the credit data when DIL and PFS events occur, and in an effort to assist borrowers in obtaining a new loan in an appropriate timeframe, DU will be updated to disregard the foreclosure information on the credit report when instructed to do so by the lender on the online loan application.

When DU identifies a foreclosure on a credit report tradeline that appears to be one that was subject to a DIL or PFS, the lender may instruct DU to disregard the foreclosure information on the credit report by entering "Confirmed CR DIL" or "Confirmed CR PFS" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU.  When DU sees this indication, the foreclosure information on the credit report tradeline that also has a DIL or PFS Remarks Code will not be used.

*See* Desktop Originator/Desktop Underwriter Release Notes DU Version 9.1 (a copy of relevant excerpts of which is attached hereto as Exhibit 5) at 6.

88.     While these changes are expected to take effect the week of November 16, 2013, *see* Exhibit 5 at 1, and hopefully will allow consumers to rightfully obtain conventional financing from that point going forward, the McCalmonts have already suffered substantial economic and non-economic harm.

<h3 style="text-align:center">V. CLAIMS<br>FAIR CREDIT REPORT ACT VIOLATIONS</h3>

89.     Plaintiff hereby incorporates by reference all well-pleaded allegations contained in the preceding paragraphs as if fully rewritten herein.

90.     Section 1681o of the FCRA provides for civil liability against any CRA that is negligent in failing to comply with any requirement imposed under the Act

91.     Section 1681n of the FCRA imposes civil liability on any CRA "who willfully fails to comply with any requirement" of the Act. *See* 15 U.S.C. § 1681n(a).

### 1. Failure To Adopt And/Or Follow Reasonable Procedures

92.     The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." *See* 15 U.S.C. § 1681e(b).

93.     The DU Findings Report generated by Fannie Mae's DU system is a consumer report as defined by Section 1681a(d) of the FCRA.

94.     On numerous occasions in the past two (2) years, Fannie Mae has prepared a consumer report concerning Plaintiffs, and disseminated such report to one or more third party(s), that failed to assure "maximum possible accuracy" of information pertaining to Plaintiffs.

95.     Fannie Mae willfully and/or negligently failed to follow reasonable procedures to assure maximum possible accuracy of the consumer reports it prepared and/or published concerning Plaintiffs, in violation of 15 U.S.C. § 1681e(b).

96.     To the contrary, Fannie Mae has affirmatively adopted and follows an unreasonable foreclosure identification procedure that, by its plain terms, knowingly misidentifies non-foreclosures as foreclosures.

97.     As a direct and proximate result of Fannie Mae's willful and/or negligent refusal to follow reasonable procedures as mandated by the FCRA, Plaintiffs have

suffered loss and damage including, but not limited to: financial loss, loss of credit opportunity, a justifiable fear to request credit, expenditure of time and resources, mental anguish, humiliation, and embarrassment, entitling them to an award of actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681o.

98. Fannie Mae's refusal to follow reasonable procedures as mandated by the FCRA reveals a conscious disregard of the rights of Plaintiffs. The injuries suffered by Plaintiffs are attended by circumstances of fraud, malice, retaliation, and willful and wanton misconduct, calling for statutory damages, an assessment of punitive damages, plus attorneys' fees and costs pursuant 15 U.S.C. § 1681n.

99. WHEREFORE, Plaintiffs, James and Katherine McCalmont, pray for judgment in their favor and against Defendant Fannie Mae and Defendant FHFA as Conservator of Fannie Mae for the following relief:

A. An award of actual damages in such amounts as determined by the jury;

B. Statutory damages pursuant to 15 U.S.C. § 1681n;

C. An assessment of punitive damages against Defendant pursuant to 15 U.S.C. § 1681n;

D. Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o; and

E. Such other and further relief as may be just and proper.

22

## VI.  JURY DEMAND

100.    Plaintiffs hereby demand a trial by jury on all their claims.

DATED: October 16, 2013.                     Respectfully Submitted,


/s/ Paul B. Mengedoth
Paul B. Mengedoth, Esq.
MENGEDOTH LAW PLLC
20909 N. 90th Place., Ste. 211
Scottsdale AZ 85255

Sylvia A. Goldsmith, Esq. (*Pro Hac Pending*)
Geoffrey B. McCarrell, Esq. (*Pro Hac Pending*)
Law Office Of Sylvia A. Goldsmith
Milano Law Building
2639 Wooster Road
Rocky River, OH 44116

Attorneys for Plaintiffs

23