Paul B. Mengedoth (018507)
**MENGEDOTH LAW PLLC**
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Tel: (480) 778-9100
Fax: (480) 778-9101
E-mail: paul@mengedothlaw.com

Sylvia A. Goldsmith, Esq. (*Pro Hac Vice*)
Geoff B. McCarrell, Esq. (*Pro Hac Vice*)
**GOLDSMITH & ASSOCIATES, LLC**
Park West Building
20545 Center Ridge Road, Suite 120
Rocky River, OH 44116
Tel: (440) 934-3025
Fax: (440) 934-3026
E-mail: sgoldsmith@sgoldsmithlawoffice.com
E-mail: gmccarrell@sgoldsmithlawoffice.com

*Attorneys for Plaintiffs James and Katherine McCalmont*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| James and Katherine McCalmont, | |
| Plaintiffs, | Case No. CV-13-02107-HRH |
| v. | |
| Federal National Mortgage Association, *et al.* | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO FANNIE MAE'S MOTION TO DISMISS** |
| Defendants. | |

In opposition to the *Motion to Dismiss* of Defendant, Federal National Mortgage Association ("Fannie Mae"), Plaintiffs, James and Katherine McCalmont, respond as follows:

**I.  PERTINENT BACKGROUND INFORMATION.**

The instant case largely presents a matter of first impression.  To understand the issues presented, it is necessary to look at Plaintiffs' situation within the historical context of the housing crisis of the past several years.

**A.  The Housing Market Collapses.**

In 2007, the United States economy suffered a dramatic downturn.  The housing bubble burst, and there was a significant negative domino effect in the lending industry as well as the investment market.  Hoards of homeowners found themselves obligated on mortgages significantly greater than the values of their underlying homes.

Short sales – a lender-approved sale of a home for less than the outstanding mortgage amount – emerged as a leading response to the growing crisis.  By 2012, the Federal Housing Finance Agency ("FHFA") announced measures to make short sales easier for owners of underwater homes.[1]  The significant growth in approved short sales has helped buoy the housing market and push distressed house prices higher in the past couple of years.[2]

---

[1] FHFA is also a defendant herein.  However, FHFA has been named solely in its capacity as the Conservator of Fannie Mae.  *See* Plaintiffs' Complaint [Doc. 1] at ¶ 7.

[2] For instance, house prices in Arizona were 22% higher in the fourth quarter of 2012 as compared to 2011.  *See*, *e.g.*, http://money.cnn.com/2013/02/28/real_estate/short-sales.

1

While a short sale allows the homeowner to sever ties with a property he or she can no longer afford, or want, to stay in, it certainly is not without consequence for him or her.  Among other things, a short sale is a significantly derogatory event in an individual's credit history.  A short sale will prevent the homeowner from obtaining mortgage financing for a period of time.  Fannie Mae, for instance, will not even consider purchasing a mortgage loan if the underlying applicant has had a short sale in the two (2) years prior to a mortgage application.  *See* [Doc. 1] at Exhibit 4, Fannie Mae's Selling Guide, Part B, Subpart 3, Chapter 5.

**B.   A Fannie Mae Procedure Prevents Plaintiffs From Moving Forward From A Short Sale.**

Plaintiffs are two of the hundreds of thousands (if not more) of homeowners who found themselves in the middle of the housing crisis.  After several months of negotiating with Chase Bank and being denied a modification of their mortgage loan, Plaintiffs were forced to negotiate a short sale; the sale of their home closed escrow in October 2009.  *See*, *e.g.*, [Doc. 1] at ¶¶ 30-34.  Plaintiffs understood that they would be unable to obtain conventional mortgage financing for the next two (2) years.  *Id.* at ¶ 36.

In October 2011, having waited the required two (2) years since completion of their short sale, Plaintiffs attempted to finance a new home.  *Id.*  Due to a counter-intuitive Fannie Mae policy to identify short sales as "foreclosures," Plaintiffs were not permitted to obtain conventional financing for a new home.[3]  *See*, *e.g.*, *Id.* at ¶¶ 39, 47.

---

[3] Fannie Mae has a procedure to identify whether a loan applicant has a short sale in their credit history.  *See* [Doc. 1] at ¶ 76 and Exhibit 3, Desktop Underwriter

2

Despite meeting all requisite lending criteria, and obtaining pre-approval from at least two (2) lenders, final approval was withdrawn because Fannie Mae advised it would not purchase a loan made to Plaintiffs because of a "foreclosure" within the previous seven (7) years.  *See Id.* at ¶¶ 36-52.  To be clear, Plaintiffs *never* had a foreclosure. Ultimately, Plaintiffs were forced to obtain a significantly more expensive personal loan to finance the purchase of a home, and were later denied refinancing of such loan because of the "foreclosure" continuing to be reported by Fannie Mae to Plaintiffs' prospective lenders.  *Id.* at ¶¶ 53-66.

These factual allegations have not been challenged by Fannie Mae.

**II.     THE FCRA WAS INTENDED TO GOVERN THIS SITUATION.**

The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, first became

---

Clarification.  So long as the short sale was completed more than two (2) years before the current application, the prospective loan is still eligible for purchase by Fannie Mae. *See Id.* at ¶ 78 and Exhibit 4, Selling Guide, Part B, Subpart 3, Chapter 5.
    Fannie Mae also has a procedure to identify whether a loan applicant has a foreclosure in their credit history.  *See* [Doc. 1] at Exhibit 3, Desktop Underwriter Clarification.  However, as Fannie Mae has publicly acknowledged, this procedure will identify not just an actual foreclosure but also a serious delinquency (noted as a "9" in the method of payment field of a credit report) as a foreclosure.  *Id.*  And Fannie Mae refuses to purchase a loan if there is an identified foreclosure in the previous seven (7) years.  *See* [Doc. 1] at ¶ 79 and Exhibit 4, Selling Guide, Part B, Subpart 3, Chapter 5. In the fallout of the housing crisis, Fannie Mae's refusal to purchase a prospective loan necessarily results in denial of credit by the lender.
    Notably, considerable concern has been raised by Fannie Mae's procedure in this regard.  *See* [Doc. 1] at ¶¶ 85-86.  In August 2013, Fannie Mae announced a change to its automated DU system to "fix" the problem.  *See* [Doc. 1] at ¶ 87 and Exhibit 5, Desktop Originator/Desktop Underwriter Release Notes DU Version 9.1.  Inexplicably, this "fix" continues to misidentify a serious delinquency as a foreclosure.  Fannie Mae's response merely allows an individual lender to overwrite Fannie Mae's recommendation when the lender knows the foreclosure identification is erroneous.

3

effective in 1971.  The impulse for the FCRA was concern over abuses in the consumer reporting arena.  Congress recognized that there exists an elaborate mechanism in the United States "for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers[,]" *see* 15 U.S.C. § 1681 (a)(2), and "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information" for use in this mechanism.  *See* 15 U.S.C. § 1681 (a)(3).

In passing the FCRA, Congress specifically found that our banking system is dependent upon lending decisions being made on accurate information.  *See* 15 U.S.C. § 1681 (a)(1) ("Inaccurate credit reports directly impair the efficiency of the banking system").  Thus, the FCRA expressly states its purpose:  "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information."  *See* 15 U.S.C. § 1681 (b).

Despite the fact that these Congressional findings were made more than forty (40) years ago, the FCRA's intent to protect the integrity of our banking system by imposing "grave responsibilities" on the entities that facilitate the use of consumer credit information in the decision lending process is highly relevant in today's electronic age:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and

> make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage to buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*See Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) (quoting 116 Cong. Rec. 36570 (1970)). The FCRA was intended to and necessarily must be viewed with a broad and inclusive lens to meet the needs of today's electronic information world.

**III.   PLAINTIFFS STATE A COGNIZABLE CLAIM UNDER THE FCRA.**

The case *sub judice* arises under the "reasonable procedures" section of the FCRA, which provides in its entirety:

> (b)   Accuracy of report.  Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*See* 15 U.S.C. § 1681*e*(b).[4] Plaintiffs claim Fannie Mae violated this mandate by following a patently unreasonable foreclosure identification procedure that caused false information to be provided to Plaintiffs' prospective mortgage financers *via* Fannie Mae's Desktop Underwriting Findings Reports ("DU Findings"). *See* [Doc. 1] at ¶¶ 92-98. These DU Findings are prepared for lenders, at least in part, to serve as a factor in

---

[4] In order to make out a *prima facie* case under 15 U.S.C. § 1681*e*(b), Plaintiffs must present evidence tending to show that "a [consumer] reporting agency prepared a [consumer] report containing inaccurate information." *See Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citing *Cahlin v. General Motors Acceptance Corp.*, 936 F2d 1151, 1156 (11th Cir. 1991). On a motion to dismiss, however, Plaintiffs need only show that their Complaint contains enough facts to state a claim for relief that is plausible on its face. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

5

the lenders' determination as to whether or not to approve a particular loan application, landing their preparation and dissemination squarely within the purview of the FCRA.

### A.  **Fannie Mae's DU Findings Are A Consumer Report.**

Fannie Mae created and operates a system called Desktop Underwriter that specifically evaluates information about a particular consumer's credit worthiness and/or credit ability, and provides a report – a recommendation even – to the lender for purposes of evaluating the consumer's eligibility for a mortgage loan. *See generally* [Doc. 1] at ¶¶ 15 - 19. Fannie Mae does not deny any of this. In its own words, Desktop Underwriter "'assembles, reviews, assesses and evaluates' the loan application-information and the credit data provided by the reporting agency, and 'generates its own report' (known as the DU Findings) which 'provides a preliminary assessment of whether the loan would meet Fannie Mae's eligibility requirements for purchase.'" *See* Fannie Mae. Memo. [Doc. 14] at 5-6.

The FCRA defines a "consumer report" as any communication "bearing on a consumer's credit worthiness, credit standing, [or] credit capacity … which is used or expected to be used … in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for - [credit, insurance or employment purposes]." *See* 15 U.S.C. § 1681*a*(d)(1). Fannie Mae does not challenge the fact that its DU Findings satisfies this definition. Nor could it really.

Desktop Underwriter is a system that has one overarching purpose: to provide lenders a recommendation as to whether or not Fannie Mae would purchase a particular,

6

albeit yet unmade, loan.  The lender can choose to follow Fannie Mae's recommendation or not.  The decision is the lender's.  But the DU Findings Report does, and is intended to, serve as a factor in this decision.  The *only* reason for Fannie Mae to make such a determination – before the loan is even made – is because the lender intends to rely on this, in whole or in part, in determining the consumer's eligibility for the loan.[5]

> MR. NICHOLAS: Freddie Mac is providing a service to the lenders and that is all it's doing. It is providing software which the lenders can use or not use.
>
> THE CHAIRPERSON: But it knows how this information is used and knows that it's giving information that bears on credit worthiness, doesn't it?
>
> MR. NICHOLAS: It is not providing information -- the information that bears on credit worthiness, if there is any, is the data that is communicated from the credit bureaus to the lenders.
>
> PANEL MEMBER: The word, caution, it's that word alone, caution. I mean, there would be a lot of lenders and mortgage brokers who would drop dead and roll around laughing if you told them that --
>
> THE CHAIRPERSON: Freddie Mac's word of caution--
>
> PANEL MEMBER: -- that Freddie Mac's word of caution doesn't bear on the credit worthiness of whether they --
>
> MR. NICHOLAS: I don't know --
>
> PANEL MEMBER: One of them is my spouse, who is a commercial lender.
>
> MR. NICHOLAS: There are, however --
>
> PANEL MEMBER: That's what I did for a living as a lawyer for 30 years,

---

[5] Fannie Mae boldly states that "*[e]very court* to review this issue" rejects Plaintiffs' theory that Fannie Mae is subject to the FCRA.  *See* [Doc. 14] at 3 (citing *Weidman v. Freddie Mac*, 338 F.Supp.2d 571.  Fannie Mae conveniently omits reference to the fact that the Third Circuit Court of Appeals heard argument in the *Weidman* matter, and offered considerable commentary from the Panel.  While Freddie Mac had successfully obtained summary dismissal of the *Weidman* plaintiff's claims, following oral argument, a confidential settlement was reached between the parties before a formal opinion was handed down.  Relevant excerpts of the transcription of the audio of the Oral Argument are attached hereto as Exhibit 1.

7

representing mortgage brokers, commercial lenders. They would die laughing. *See* Exhibit 1 at 37-40.

### B. Fannie Mae Is A Consumer Reporting Agency With Respect To Its Preparation of DU Findings.

The crux of Fannie Mae's *Motion to Dismiss* is the argument that it is not a consumer reporting agency. *See*, *e.g.*, Fannie Mae's Memo. at 8-9.[6]  The FCRA defines a consumer reporting agency as follows:

> any person which, for monetary fees, dues, or on a cooperative nonprofit basis regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681*a*(f).  In Fannie Mae's own words, an entity is a consumer reporting agency "if that entity (1) regularly assembles or evaluates information on consumers, (2) with a purpose to furnish consumer reports to others, (3) in exchange for compensation, and (4) uses interstate commerce to prepare and furnish the consumer report." *See* [Doc. 14] at 8 (citing *Lewis v. Ohio Prof. Electronic Network, LLC*, 190 F.Supp.2d 1049, 1056 (S.D. Ohio 2002)).  Fannie Mae meets every aspect of this definition in its preparation of DU Findings.[7]

### 1. Fannie Mae Admits That It Regularly Evaluates Consumer Information To Furnish Reports To Its Lender Subscribers.

---

[6] Plaintiffs' Complaint specifically alleges that Fannie Mae is a consumer reporting agency ("CRA") with respect to the preparation of DU Findings.  *See* [Doc. 1] at ¶ 8.
[7] Fannie Mae only challenges the first two (2) of the elements it cites.  As such, those will not be addressed by Plaintiffs here.

8

While taking the formal stance that it does not "assemble or evaluate" consumer information for the purpose of "furnish[ing] consumer reports to others," Fannie Mae utilizes these exact words to describe what it does:

> [Desktop Underwriter] … "assembles, reviews, assesses and evaluates" the loan application-information and the credit data provided by the reporting agency, and "generates its own report" known as the DU Findings, which "provides a preliminary assessment of whether the loan would meet Fannie Mae's eligibility requirements for purchase."

*See* [Doc. 14] at 5-6 (quoting Plaintiffs' Complaint at ¶ 22).

Fannie Mae relies heavily on the fact that its DU Findings advise whether or not Fannie Mae is willing to purchase the prospective loan if made.[8] But, as pointed out

---

[8] In this respect, DU Findings are distinguishable from traditional credit reports which pull information together solely for use by the lender. However, much else of what Fannie Mae relies upon to argue that it is not a consumer reporting agency shows great similarity between its preparation of DU Findings and the preparation of traditional credit reports Equifax, Experian, and Trans Union ("the Big Three"). For instance, Fannie Mae attaches a document entitled "Master Terms and Conditions" as an example of the contract lenders must sign "to enable them to use" Desktop Underwriter, *i.e.* the system through which the DU Findings Report is accessed. *See* [Doc. 14] at 5, and at Exhibit 1. Fannie Mae uses this contract to argue that is merely acting as "the lender's limited agent under the express terms of their agreement." *Id.* at 6. Fannie Mae conveniently fails to mention that this contract is remarkably similar to the "Subscriber Agreements" that each of the Big Three requires lenders to use in order to enable access to their respective databases, *i.e.* the systems through which traditional credit reports are accessed. Through the discovery process, these similarities could be confirmed.

Similarly, Fannie Mae argues that "[t]he DU Findings do not require lenders to approve or reject any particular loan. Rather, it is the lender that makes the final decision." *See* [Doc. 14] at 6. This, too, is precisely in line with the credit reports prepared by the Big Three. Notably, *both* types of reports pull together information which is intended to serve "as a factor in establishing the consumer's eligibility" for the particular loan. *See* 15 U.S.C. § 1681*a*(d)(1). If anything, as Fannie Mae admits, the DU Findings go one step *further*, evaluating the information it has pulled together to

9

above, this is the very reason why lenders pay Fannie Mae for DU Findings.  Fannie Mae knows its recommendation is intended to, and will, be utilized by the lender as a factor in determining whether the loan will be approved; there really exists no other reason for Fannie Mae to make such a determination before the loan is even made.[9]

### 2. No Exception Saves Fannie Mae From Qualifying As A Consumer Reporting Agency.

Fannie Mae is desperate to escape liability for the fact that it knowingly fails to abide by any of the mandates of the FCRA, specifically taking no measures to assure the "maximum possible accuracy" of the credit data it sells to mortgage lenders through its DU Findings.  So Fannie Mae presses the argument that it should be deemed a "joint user" of information rather than a consumer reporting agency.  *See* [Doc. 14] at 10-13.  This argument is ill-conceived and inapplicable here.

---

make a "recommendation" about this particular consumer's eligibility for this particular loan.  *See* Fannie Mae Memo at 6.

Fannie Mae also comments that "there are no allegations that Fannie Mae re-sells the DU Findings to third parties, nor does it."  But that has no relevance here.  While there are several obligations imposed by the FCRA on re-sellers of consumer reports, none of them have been alleged here or apply to the instant facts as alleged in Plaintiffs' [Doc. 1].  *See* 15 U.S.C. § 1681*e*(e) ("Procurement of consumer report for resale.").  Yes, the Big Three allow their credit reports to be resold, and Fannie Mae does not.  But that fact has no bearing on whether or not the conduct of the entity satisfies the definition of a consumer reporting agency with respect to the preparation of the consumer report for original sale.

[9] *See, e.g.,* Exhibit 1 at 36 ("PANEL MEMBER:  If I go out to try to have a home loan, you know or well know because it's in the papers, part of you conceded it, that the whole world wants to comply with Freddie Mac or Fannie Mae's standards because they know that makes the thing marketable on the second market. I have seen, when I was practicing, we were using Freddie Mac forms even for loans we knew were never going to Freddie Mac. * * * They say, we wouldn't buy this loan, or we would hesitate to buy this loan, caution, doesn't that impact the credit worthiness of the borrower, very, very directly?").

10

### a. A "Joint-User" Exception Is Not Factually Supported Here.

The joint user concept – a concept that is not found anywhere in the FCRA – stems from the Federal Trade Commission ("FTC") Commentary which describes an exception to the definition of consumer reporting agency as follows:

> Entities that share consumer reports with others that are jointly involved in decisions for which there are permissible purposes to obtain the reports may be "joint users" rather than consumer reporting agencies.

*See* FTC Commentary on the FCRA, 16 C.F.R. Pt. 600 app. Sec. 603(f)(8). By its terms, the joint user exception is self-limiting; it involves only those situations where a person or entity shares a consumer report with another or is involved in the same decision for which the report is being used. In such a case, the entity sharing the consumer report does not become a "consumer reporting agency" simply because it is sharing the information with a joint user rather than selling information to the other person or entity as is the case here. The Commentary provides three (3) examples of such situations, specifically including "an agent or employee who obtains a consumer report and forwards it to its principal or employer." *Id.*[10]

Here, as Fannie Mae insists, it functions independently of its subscribing lenders, and those lenders do nothing more than consider Fannie Mae's "recommendation" in making their own decisions as to whether or not to approve an individual consumer's

---

[10] As the first two examples have no application here and, in fact, Fannie Mae has specifically claimed an agency relationship with the particular lender, that is the only exception that will be addressed here.

loan application. *See, e.g.*, [Doc. 14] at 6. Fannie Mae is an independent business that sells a product to these lenders for a fee.

Likewise, the evidence proffered by Fannie Mae falls far short of establishing a principal-agent relationship between Fannie Mae and its subscribing lenders. An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent. *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1434 (3d Cir. 1994) (quoting *Sears Mortgage Corp. v. Rose*, 634 A.2d 74, 79 (N.J. 1993)); *see also Menichini v. Grant*, 995 F.2d 1224, 1233 n.14 (3d Cir. 1993) ("Agency law recognizes the principal's ability to control and monitor agent behavior."); Restatement (Second) of Agency § 1(1) (1958) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act.").[11]

The relationship between Fannie Mae and its subscribing lenders simply does not meet the requirements of an agency relationship. First, there is no record evidence that the principal (the lender) has any right of control over Fannie Mae's actions. It is universally required for a principal-agent relationship that the principal maintain the right of control over the agent. *See Winback*, *supra*, 42 F.3d at 1434; *Federal Pants,*

---

[11] Courts typically apply general common law principles of agency to the FCRA rather than the law of any particular state. *See Kodrick v. Ferguson*, 54 F.Supp.2d 788, 794 (N.D. Ill. 1999) (legislative history indicates that Congress did not intend to differing rules of agency law to be applied in each forum.); *Del Amora v. Metro Ford Sales and Serv., Inc.*, 206 F.Supp.2d 947, 951 (N.D. Ill. 2002) (federal courts have adopted the Restatement of Agency as the basis for federal common law as applied to the FCRA).

*Inc. v. Stocking*, 762 F.2d 561, 564 (7th Cir. 1985) (element of agency relationship is "the understanding of the parties that the principal is to be in control of the undertaking and that the agent shall serve as a fiduciary subject to the directions of the principal.").

Nothing in anything provided by Fannie Mae suggests that the lender has the right to control Fannie Mae in its evaluation of credit information and its generation of the DU Findings. The lender has no right of control over Fannie Mae's use of its proprietary Desktop Underwriter algorithms, and Fannie Mae has an unfettered right to modify the formula at any time. The lender has no control over the contents of the DU Findings report, nor can they make any changes to it.[12]

Second, there is no evidence of mutual assent that, in running Desktop Underwriter, Fannie Mae is acting on the lender's behalf as its fiduciary. An agent owes fiduciary duties to its principal, including the duty to account for profits and not to act adversely to the principal's interests. *See* Restatement (Second) of Agency § 13 cmt. A (1958). There is no evidence that Fannie Mae's relationship with the lender involves any such duties. Rather, Fannie Mae contracts with the lender to accomplish a particular task: evaluation of a loan applicant's credit. Fannie Mae performs this evaluation for its own purposes. The DU Findings recommendation of "refer with caution" or "accept" is valuable to Fannie Mae for reasons independent of the lender's decision to approve the loan or not. The lender buys the report and uses it to decide whether to *make* the loan.

---

[12] Arguably, the "fix" announced last August does allow lenders to go in and overwrite a wrongly identified short sale. *See* [Doc. 1] at Exhibit 5, Desktop Originator/Desktop Underwriter Release Notes DU Version 9.1.

Fannie Mae compiles the report for a different purpose, *i.e.*, to help it determine whether it would *buy* the loan if it becomes available on the secondary market.

### b. Regulatory And Legal Authority Confirms Fannie Mae Is A Consumer Reporting Agency.

Interpretations of the FCRA by both the FTC and federal courts further contradict Fannie Mae's agency-joint user argument.

The FTC Commentary makes it clear that those entities who procure and disseminate consumer reports to third parties – but who do not participate jointly in the ultimate decision – are consumer reporting agencies subject to the FCRA and *not* joint users. For instance, an employment agency that obtains information on job applicants and furnishes it to a prospective employer is a consumer reporting agency. *See* FTC Commentary on the FCRA, 16 C.F.R. Pt. 600 app. Sec 603(f)(4). Similarly, an entity that compiles claim payment information on prospective insureds and furnishes it to insurance companies for use in underwriting decisions is a consumer reporting agency. *Id.* at 16 C.F.R. Pt. 600 app. Sec. 603(f)(5). And private investigators who regularly obtain consumer reports and furnish them to their clients may be consumer reporting agencies. *Id.* at 16 C.F.R. Pt. 600 app. Sec. 603(f)(6).

Moreover, the FTC has repeatedly concluded that entities that provide consumer reports to clients or in response to a specific request are consumer reporting agencies. The FTC has opined that an entity that provides employee screening services for client-employers (criminal history searches, Social Security number checks, education and

employment verifications) is a consumer reporting agency and *not* a joint user.  *See* FTC Informal Staff Opinion Letter:  Haynes (June 9, 1998).  The FTC concluded:

> Your company is not simply an extension of these employers for FCRA purposes; rather it is an independent entity hired by employers and meets the definition of a "consumer reporting agency" in Section 603(f) of the FCRA.

*Id.*  Similarly, the FTC concluded that, if a bank uses an "intermediary" entity to pull credit reports from the credit repositories and merge them into a single streamlined consumer report it provides to the bank, the intermediary is a consumer reporting agency.  *See* FTC Informal Staff Opinion Letter:  Kane (Oct. 27, 1997).  Significantly, the FTC nowhere mentioned a joint user exception even though the intermediary performs a particularized service for a particular entity.

Finally, the FTC concluded that an entity that performs a similar function for automobile lenders as Fannie Mae does for mortgage lenders is a consumer reporting agency.  *See* FTC Informal Staff Opinion:  Grimes (June 9, 1993).  The entity, Lendernet, received loan application information from automobile dealers, whereupon it obtained the applicant's credit report.  It would then scan potential lender requirements and provide the dealer with a list of lenders.  At the same time, it would provide application and credit information to lenders and provide them with a list of all dealer loan applications that meet Lendernet's criteria.  The FTC opined that Lendernet was a consumer reporting agency.

The FTC Commentary and Staff Opinions make it clear that an entity such as Fannie Mae does not become an agent-joint user simply because it performs credit-

related functions for a particular entity.  In such situations, the relationship is simply that of independent contractor, not principal-agent.  Thus, a joint user exception has no factual or legal application here.

Contrary to Fannie Mae's bold assertion that "[e]very court to review this issue has rejected Plaintiffs' position," *see* [Doc. 14] at 3, the most recent case touching the issues presented here expressly discards the *Weidman* decision so heavily relied upon by Fannie Mae here.  *See Adams v. National Engineering Svc. Corp.*, *et al.*, 620 F.Supp.2d 319 (D. Conn. 2009).[13]

In *Adams*, *supra*, the court considered the propriety of applying a joint-user exception to an entity that otherwise clearly satisfied the statutory definition of a consumer reporting agency.  *See Adams*, *supra*, 620 F.Supp.2d at 327.  After noting that FTC Commentary was intended only as a guideline, not binding law, the court refused to follow the *Weidman* reasoning:

> [T]he court knows of nothing in the FCRA or elsewhere which indicates that Congress intended to authorize the FTC to create a 'joint-user' exception to the FCRA definition of a consumer reporting agency.  In fact, such an exception strikes this court as contrary to the "ambitious objective" Congress set out in the Act's statement of purpose.

*Id.* (citing 15 U.S.C. § 1681(b); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 62 (2007)).

---

[13] Fannie Mae also fails to mention that the *Weidman* case was significantly distinguishable from the instant case on its facts:  the plaintiff there suffered no adverse action as a result of anything published about him in a consumer report, and the "false" information plaguing the plaintiff came directly from his credit report, not Freddie Mac's mischaracterization of same.

16

## IV. CONCLUSION.

In keeping with the plain language as well as the spirit of the FCRA, DU Findings are a consumer report and Fannie Mae's preparation and sale of same are subject to the mandates of the FCRA. For this reason, and for all of the reasons enumerated herein, Fannie Mae's *Motion to Dismiss* should be denied in its entirety.

Dated this 11th day of April, 2014.        Respectfully Submitted,


        */s/ Sylvia A. Goldsmith*
Sylvia A Goldsmith (*Pro Hac Vice*)
Geoff B. McCarrell (*Pro Hac Vice*)
**GOLDSMITH & ASSOCIATES, LLC**
Park West Building
20545 Center Ridge Rd., Suite 120
Rocky River, OH 44116
Telephone: (440) 934-3025
Facsimile: (440) 934-3026
E-mail: sgoldsmith@sgoldsmithlawoffice.com
E-mail: gmccarrell@sgoldsmithlawoffice.com

Paul B. Mengedoth (018507)
**MENGEDOTH LAW PLLC**
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Tel: (480) 778-9100
Fax: (480) 778-9101
E-mail:  paul@mengedothlaw.com

*Attorneys for Plaintiffs*

17

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing ***Plaintiffs' Memorandum in Opposition to Fannie Mae's Motion to Dismiss*** is being filed electronically with the United States District Court for the District of Arizona, on this 11th day of April, 2014. Notice of this filing will be transmitted to counsel of record by operation of the Court's electronic filing system.

                                  */s/ Sylvia A. Goldsmith*
                                  Sylvia A. Goldsmith, Esq.
                                  **GOLDSMITH & ASSOCIATES, LLC**
                                  *Attorney for Plaintiffs*